## SAN ANTONIO TRACTION CO. v MENDEZ. (No. 5922.)

(Court of Civil Appeals of Texas. San Antonio. Dec. 12, 1917. Rehearing Denied Jan. 9, 1918.)

TRIAL &#9639;=&gt;315—CONDUCT OF JURY—MANNER OF ARRIVING AT VERDICT.

In action for personal injuries, it was flagrant misconduct for the jury in assessing damages to consider the fact that the plaintiff's attorneys would receive 50 per cent. of the recovery, and to double their verdict on that account, and to consider items for hospital, medicine, and physicians not submitted to it.

Appeal from District Court, Bexar County; R. B. Minor, Judge.

Action by Carlotta Mendez against the San Antonio Traction Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Templeton, Brooks, Napier & Ogden, of San Antonio, for appellant. Dwyer & Dwyer, Perry J. Lewis, Champe G. Carter, Randolph L. Carter, and H. C. Carter, all of San Antonio, for appellee.

FLY, C. J. This is a suit for damages resulting from personal injuries alleged to have been inflicted through the negligence of appellant, in the derailment of one of its cars, near the corner of Medina and Ruiz streets,

in the city of San Antonio, on December 9, 1915. A trial by jury resulted in a verdict and judgment for appellee in the sum of $15,-000.

The first, second, and third assignments of error complain of the judgment of the court on the ground that there was such misconduct of the jury as to the discussion of the amount that the attorneys of appellee would receive out of any sum found by the jury as damages as to invalidate their verdict. The evidence of several of the jurors, who testified, was that the matter of attorneys' fees, was mentioned while the amount of the verdict was being discussed. One of the jurors stated that after it had been stated that appellee and her attorneys would divide the amount recovered "fifty-fifty," the other jurors talked him into giving $15,000. That juror, as well as others, had made voluntary affidavits before the hearing to the effect that in arriving at a verdict they had considered the fact that attorneys for appellee would receive one-half of any sum recovered. At least four or five of the jurors had signed an affidavit that the jury had agreed that each one should write the amount to which he believed appellee was entitled, add those amounts together and divide by the number of jurors, and that the quotient should constitute the verdict.

Adolph Weyel, one of the jurors, stated that while they were adding doctors' bills, medicine, and time lost, "somebody suggested about the lawyers, and said they fought these cases usually for half, and then after that conversation took place and then later on, we doubled the $4,000, and made it $8,000." This juror had previously signed an affidavit that he had considered the talk about the attorneys' fee in arriving at his verdict, but denied it at the trial, because while he could read and write English he was sick and did not understand it.

All of the jurors who signed affidavits had, according to their testimony, received information that acting on statements made as to attorneys' fees was in contempt of court. That information, they stated, had been obtained between the time the affidavits were signed and the hearing on the motion for new trial. Those affidavits showed the condition of the minds of the jurors on the subject immediately after the trial, before they realized what might result from their statements that they considered the question of attorneys' fees in connection with the amount of their verdict.

Edward Levy, foreman of the jury, signed an affidavit in which it was stated:

"That this affiant as a juror considered the fact that the plaintiff's attorneys would get one-half of the recovery in arriving at his verdict, and was influenced thereby."

The affidavit was placed in his hands by an agent of appellant, but he held it several hours and signed it in his office when no one was present except his stenographer and him-self. No compulsion was used, nor inducements held out to the juror to sign it. He testified:

"The traction company did not threaten me a bit, and I signed it of my own accord at the request of Mr. Johnston after he went over the facts with me."

Max Polunsky, a juror, testified to a discussion of the question of attorneys' fees and how much should be given appellee, and some of the jurors said:

"That in order for her to get that amount we would have to double that, to make that amount, you understand; now, for instance, if we decided to give her $5,000, why we would have to make that ten in order for her to get five, because the attorneys were figured in, because the attorneys would get half. Of course that did not affect me in any way, because I wasn't worried about the attorneys, whether they got anything or not. * * * "

He also stated:

"I believe some of them based their verdict, I am not sure, but I should think that some of them based their amounts on that. * * * "

The last-named juror said he started in for a verdict of $4,000, and then went to $8,000 after the discussion narrated by him. He signed an affidavit, after having it all day, that he had been influenced by the talk about attorneys' fees. He swore that, while he had the affidavit, "I did study it; I looked it over carefully." He also testified:

"I was not influenced personally by attorneys' fees, but I say it was mentioned in the jury room by some of the jurors, and I think they based the amount on that because when they said $4,-000 why they had doubled it and whatever amount they decided they figured it had to be doubled."

While this juror claimed for himself superior strength of mind, or a higher conception of his duties as a juror, his testimony leads to the inevitable conclusion that he was taking himself as a model by which to judge his fellows when he concluded they were influenced by the discussion of attorneys' fees. He was the juror who started with $4,000, and after the discussion jumped to the sum of $8,000, and finally ended by agreeing to a verdict of $15,000. He almost doubled the doubled $4,000. The juror afterward indicated doubts as to the propriety of considering the fees, and also that under favorable circumstances he might unbosom himself, for he requested the court to instruct him as to the propriety or impropriety of such conduct. The court, however, declined to give the information.

George Wrase, a juror, stated that nothing was said, so far as he knew, about attorneys' fees in the jury room, and yet admitted that he had signed and sworn to statements that fees had been mentioned, and that he had been influenced thereby, and that the statements were true, and further:

"I would not have sworn to them if I had thought they were not true. I don't say they are not true."

He stated that he understood everything in the affidavit except the word "deliberate."

Hal W. Tucker, a juror, admitted that he

had signed an affidavit similar to that signed by the other jurors mentioned, and although he had the part stricken out as to the sum obtained by dividing the sum of the different amounts suggested by the different jurors by the number of jurors, was the verdict, he signed the balance. Before he testified he had learned that it was wrong to discuss attorneys' fees in the jury room.

Adin Houck stated that the jurors were to be tried on their conduct in the jury room. That was told him after he had signed an affidavit like unto the others and before he testified at the hearing of the motion for new trial. He testified:

"I was for $4,000, and I went up to $8,000, more according, not exactly according, to attorneys' fees, but more because I wanted to."

He testified on cross-examination that he only considered the evidence and charge of the court in arriving at a verdict, and yet some influence raised his verdict from $4,000 to $15,000.

Montanio, Ehrhardt, and Feille, jurors, swore that they did not hear any mention of attorneys' fees.

L. W. Durrell, on examination by appellee, swore that he heard the matter of attorneys' fees mentioned in the jury room in a casual way, and that he did not consider the fees in arriving at a verdict. He also testified that before the hearing on the motion for new trial that he had been told by the prosecution that it was the law "that it was not proper for a jury to consider attorneys' fees in arriving at their verdict, and he said' if they did do it they were in contempt of court; that is what he said."

Adolph Weyel signed one of the affidavits mentioned herein, admitting that the discussion of the attorneys' fees had influenced his verdict, but swore on the examination in chief, by appellee, that the fees had not entered into his verdict. On cross-examination he testified:

"As to how the conversation came up that in most instances the lawyers tried or fought these cases for half, well, first they added together in figuring up how much it would cost Miss Mendez, the doctors' bills and everything like that, and they figured it about $4,000, and then I believe they doubled it because may be she has got to suffer some two or three years more, that was the reason for doubling."

Again he swore:

"The things we considered when we figured up the $4,000 was the time she was laying in bed, the lost time in work, and her mother's work, the doctors' bills, hospital bills, and drugs; I took all those in my own mind when I figured up the $4,000. Then somebody mentioned attorneys' fees, and that was added in. Then somebody suggested about that possibly she would suffer some more, and I took that in consideration, and all these things that have been mentioned, I took into consideration."

Immediately after making that unequivocal statement, he again testified that he did not consider "attorneys' fees in going up to any amount."

We have never considered a more flagrant case of the consideration of matters not mentioned in the pleadings or evidence than is shown by the facts of this case. Four or five of the jurors, after full consideration of the contents, signed affidavits stating that attorneys' fees had been considered and the heavy verdict brought about by such consideration. In other words, after deliberating as to the amount of damages incurred by appellee and ascertaining a certain sum that appellee should recover, that was doubled to offset attorneys' fees. There was one half of the verdict, at least in the minds of part of the jury, in favor of the client, and the other half in favor of her attorneys.

If only one juror had signed an affidavit, it might be thought that he had been misled or deceived, but it is inconceivable that four or five average citizens could, after due consideration, be induced to swear to a false statement about what had occurred in the jury room. Their testimony on the hearing, given under fear of being held in contempt of court, while evasive and intended to contradict the affidavits, shows the truth of the written affidavits made by them. The consideration of attorneys' fees was not only not upheld by pleadings or proof, but as directly in the face of the measure of damages given by the charge of the court, and the jurors were truthfully informed by appellee that the consideration of such matters was contrary to law and in contempt of the court. Not only did the jury consider attorneys' fees, but also doctors' bills, drug and hospital bills, and compensation for the services of the mother of appellee, which were not submitted as items of damages by the court.

The question before the court was fully discussed in the case of San Antonio Traction Co. v. Cassanova, 154 S. W. 1190, in which only two jurors testified that attorneys' fees had been discussed, and this court held:

"It is clear that there was a general discussion of matters by the jury that were not alleged in the pleadings, nor that appear in the evidence. At least one of them admitted that he took those matters into consideration, and any one who is acquainted with human nature must be convinced that it influenced others."

The facts of that case are mild as compared with the testimony in this, and while there was some sort of denial of being influenced by the discussion of the attorneys' fees, yet the affidavits and the testimony show beyond cavil or doubt that attorneys' fees entered into and became a part of the verdict. The denial of being influenced by the testimony in the jury room carries with it but little force, even though uncontradicted, for, as said in the Cassanova Case:

"We see no particular force in such denial, because the influence of such discussions is so subtle and appeals to human nature so strongly that the influence might, in some instances, be exerted without the juror being aware of it.

In other instances fear of punishment at the hands of the trial judge would cause denials of influence upon the verdict."

In the present case the latter part of the quotation applies with peculiar force, for each of the jurors who made the affidavits, if not all of them, had been informed that what they had done was contempt of court, and in one instance the juror was told that the jury was to be tried on the hearing of the motion for new trial. A verdict cannot be sustained under the circumstances surrounding this case. As said in the Cassanova Case:

"The authority will not be given to jurors to formulate and act upon a different measure of damages from that prescribed by law and given to them in the charge of the court. It is uniformly held that it is error to permit proof of damages not alleged, and how much graver the error when matters are considered which were neither alleged nor proved."

In the case of Steele v. Dover, 170 S. W. 809, only one juror testified in regard to the discussion of attorneys' fees in the jury room, and this court held, through Associate Justice Moursund:

"While the juror, upon cross-examination, made the general statement that he observed his oath, which was natural, his testimony shows clearly that he was influenced by the belief that the attorneys would get half. He was one of those in favor of a very low amount; he says the reason for giving plaintiff so much was on account of such belief. Many jurors do not realize the impropriety of taking such matters into consideration, and, after doing so, do not realize that they have not tried the case upon the evidence admitted by the court."

The evidence in that case was not near so strong as this as to the consideration of attorneys' fees in making up the verdict; in fact, no case has come to our notice in which such flagrant disregard of rules should govern a jury in considering their verdict has been shown as was clearly proven in this case. One juror seems to have considered any matter foreign to the evidence that could in his mind justify him in increasing the verdict.

The evidence was sufficient to take the case to the jury, and the assignments of error questioning the sufficiency of the evidence to require its submission are overruled. The matters raised by the other assignments of error will probably not arise on another trial, and therefore need not be considered,

On account of the misconduct of the jury, the judgment is reversed and the cause remanded.